IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA
Plaintiff

v.

Case No. 19-cr-544-TPB-TGW

**GUSTAVO JAUREGUI (13)**
Defendant

**SENTENCING MEMORANDUM**

**COMES NOW** the defendant Gustavo Jauregui, by and through the undersigned counsel, who hereby respectfully states, avers, and submits this memorandum in anticipation of his sentencing hearing. After considering the multitude and significance of the mitigating factors in this case, the Honorable Court should depart from the sentencing guideline recommendation and impose a time-served sentence. If there ever was to be a defendant entitled to a time-served sentence for this conviction, it would be Mr. Jauregui. Mr. Jauregui has been incarcerated since November 6, 2019.

**I. PLEA AGREEMENT**

The government and Mr. Jauregui entered into a plea agreement whereby Mr. Jauregui agreed to cooperate with the government. Docket No. 299. Pursuant to the plea agreement, Mr. Jauregui pled guilty to count one of the indictment, which is for conspiracy to possess with intent to distribute 5 kilograms or more of cocaine while on board a vessel subject to the jurisdiction of the United States. *See* 46 U.S.C. §

70506(a) and (b) and 21 U.S.C. § 960(b)(1)(B)(ii). The plea agreement calls for the dismissal of the other remaining count in the indictment.

Despite Mr. Jauregui's status as a first-time offender, the statutory minimum terms of punishment are 10 years of incarceration and 5 years of supervised release. However, Mr. Jauregui's satisfactory cooperation releases him from these draconian mandatory minimums. *See* Docket No. 435; 18 U.S.C. § 3553(e) and (f).

The presentence investigation report calculates the total offense level at 31. Docket No. 424 at p. 9. However, the government subsequently filed a motion for an 8-level downward departure based upon Mr. Jauregui's substantial assistance. *Id.* Thus, if the Court were to grant this motion, that would leave Mr. Jauregui with a total offense level of 23, which would call for a recommended sentencing range from 46 to 57 months of incarceration. While this is a substantial reduction, we submit that the interests of justice warrant a downward departure.

## II. APPLICABLE LAW

The sentencing process in federal court has undergone significant changes since the adoption of the sentencing guidelines in 1987. Perhaps the most concise historical summary was penned by Judge Posner:

> Before there were guidelines, a federal judge in picking a sentence ranged essentially at will within the typically broad statutory sentencing limits, appellate review of the choice of sentence within those limits being minimal, even perfunctory. The guidelines [adopted in 1987] sought to narrow judicial discretion by creating sentencing ranges inside the statutory minimums and maximums and limiting departures from the applicable range. *Booker* [decided in 2005] unbound the sentencing judges from the guidelines; and while the judges are still required to consider them, they may not ignore substantial arguments for deviating, and can if they wish reject the penal theories that

> inform the guidelines and (within reason) devise and follow a different penal theory. [This new approach to sentencing is] coupled with the requirement that appellate review of sentences is now to be robust, albeit deferential, unlike the attitude of almost total deference that prevailed before the guidelines were promulgated . . .

Introduction, 3 Fed. Prac. & Proc. Crim. § 532 (4th ed.) (alterations in original) (citing *United States v. Aguilar-Huerta*, 576 F.3d 365, 366 (7th Cir. 2009), cert. denied, 130 S. Ct. 811, 175 L. Ed. 2d 569 (2009)); *see also United States v. Irey*, 612 F.3d 1160, 1180-1192 (11th Cir. 2010) (en banc), cert. denied, 131 S. Ct. 1813, 179 L. Ed. 2d 772 (2011).

"The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." *Nelson v. United States*, 129 S. Ct. 890, 892, 172 L. Ed. 2d 719 (2009) (italics in original); *United States v. Vidal-Reyes*, 562 F.3d 43, 49 (1st Cir. 2009) ("After Booker, the applicable guidelines range is treated merely as advisory and the sentencing court is free to exercise its discretion to impose a reasonable sentence outside the guidelines range that is 'sufficient, but not greater than necessary' based on the factors articulated in § 3553(a)." (citations omitted)); *see also United States v. Cavera*, 550 F.3d 180, 188-89 (2d Cir. 2008) (en banc) ("It is now, however, emphatically clear that the Guidelines are guidelines—that is, they are truly advisory. A district court may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense. District judges are, as a result, generally free to impose sentences outside the recommended range. When they do so, however, they must consider the extent of the deviation and ensure that

the justification is sufficiently compelling to support the degree of the variance. In this way, the district court reaches an informed and individualized judgment in each case as to what is 'sufficient, but not greater than necessary' to fulfill the purposes of sentencing. (internal quotations and citations omitted)), cert. denied, 129 S. Ct. 2735, 174 L. Ed. 2d 247 (2009).

### III. MITIGATING FACTORS

Mr. Jauregui's case is rife with mitigating factors that would call for a downward departure from the sentencing guidelines. The mitigating factors are separated into six sections: (1) reasons for committing the offense, (2) first time offender, (3) substantial assistance, (4) incarceration during unprecedented pandemic, (5) remorse and finding God, and (6) character letters. Mr. Jauregui has been incarcerated since November 6, 2019. As detailed below, such a sentence is "sufficient, but not greater than necessary" given unusual nature of Mr. Jauregui's situation. *See* 18 U.S.C. § 3553(a).

**A. Reasons for Committing the Offense**

*i)     His Son's Medical Needs*

Mr. Jauregui's youngest son, Jhoanguel Jauregui suffers from cancer and lupus, a relatively rare disease requiring specialized treatment. *See* Exhibit 1 (Medical History). According to the Mayo Clinic's official website, "Lupus is a disease that occurs when your body's immune system attacks your own tissues and organs (autoimmune disease). Inflammation caused by lupus can affect many different body systems — including your joints, skin, kidneys, blood cells, brain,

4

heart and lungs."[1] The National Cancer Institute asserts that "Cancer is a disease in which some of the body's cells grow uncontrollably and spread to other parts of the body."[2] An excerpt of Jhoanguel's medical history is enclosed below:

> SUCCESSIVE MEDICAL HISTORY CURRENT ILLNESS: This is a 28-year-old male patient who has a history of resection of soft tissue tumor in the left chest wall on two occasions (2011 and 2017), the last biopsy reported malignant mesenchymal tumor but did not receive additional treatment. Currently, he is here because since August 2019, he began to present axillary tumor, fast growing, non-painful, associated with local pain. He goes again to the physician who decides to refer him to this consultation.
> PERSONAL HISTORY: Lupus: currently untreated due to failure to obtain treatment. . . . Surgical: left pectoral tumor resection in 2001 and December 2017. Allergies: metoclopramide and merthiolate.
> PHYSICAL EXAMINATION: Neck: no adenomegaly is palpable. Chest: there is evidence of a lesion in the axillary region extending from the mid-clavicular line to the posterior axillary line, measuring approximately 30 × 15 cm, lobulated, elastic consistency, mobile, towards the posterior axillary line there is evidence of a nodular area of 6 cm in diameter, with an impressive skin infiltrate, which looks purplish in appearance. There is evidence of scar in the left axillary region of approximately 10 cm overlying the lesion between the anterior and posterior axillary lines.
> PATHOLOGICAL ANATOMY: IHC No. 1201201123 (7/4/12): Left axilla: epithelial tumor with organoid, trabecular pattern and with cystic changes. Only marked for specific neural enolase. Biopsy No. 005-B-2018 (12/14/17); Left pectoral region: malignant mesenchymal neoplastic proliferation measuring 7 × 7.5 × 6 cm. Compatible with malignant fibrous histiocytoma with angiomatoid component.
> IMAGING: Soft tissue ultrasound (5/28/20): Left sub-axillary region: Central group chain lymph nodes number 2 are enlarged, with loss of architecture, positive Doppler, measuring 8.37 × 5.82 cm and 3.30 × 2.91 cm. Chest CT (9/9/20): Two solid, heterogeneous lesions in the left axillary region, in contact with costal arches but not infiltrating.
> . . .
> PATHOLOGICAL ANATOMY: Biopsy No. 1620-20 (12/21/20): Left axillary region: Low-grade malignancy fibrous histiocytoma. Tumor size 15.0 × 13.0 cm. Encapsulated. Areas of cystic degeneration. Resection edges free of neoplasia. Vascular invasion not evident.
> DIAGNOSES: Recurrent left axillary soft tissue sarcoma; Low-grade fibrous histiocytoma pT2a N0 M0 G1 ST II. PLAN: The patient is referred to radiation therapy for local control. It should be emphasized that the patient

---

[1] https://www.mayoclinic.org/diseases-conditions/lupus/symptoms-causes/syc-20365789.
[2] https://www.cancer.gov/about-cancer/understanding/what-is-cancer.

did not visit the clinic until today to bring the result of the biopsy, having passed more than four months since surgery, the risks and benefits of treatment should be considered. Evaluation by consultation every three months.

*Id.*

Jhoanguel was diagnosed with lupus at the age of 12 and has suffered from—and continues to suffer from—large cancerous tumors. He has been operated on three times and requires expensive lifelong treatment. He was recently referred to radiation therapy to control the latest malignant mesenchymal tumor. Moreover, the presentence investigation summarizes this medical history as follows:

> The defendant's son, Jhoangel, suffers from lupus and cancer. His son was diagnosed with lupus when he was 12 years of age. Jhoangel's condition requires constant medical care. Currently the medication he needs is not available in Venezuela, therefore, family members bring these medications from Peru and Colombia. Prior to the financial crisis in Venezuela [that began in 2010 and continues to this day], the government subsidized the cost of this medicine. However, the defendant reports he is no longer able to get the medication in Venezuela. Jauregui reports that it has been very costly to obtain his son's medication from other countries. In 2017, Jhoangel had an operation to remove a cancerous growth. In December 2020, Jhoangel required another operation because the mass grew back. Both of these procedures were costly, and the defendant had to "sell what little we had to afford it." Jauregui explained that he did not have enough money to continue providing the proper medical care for his son, and this was his primary motivation for committing the instant offense.

Docket No. 424 at pp. 10-11 (footnote omitted; alteration paraphrased from the omitted footnote).

Unfortunately, due to the Jauregui family living in Venezuela, a deteriorating third-world country, Jhoanguel's treatment is suboptimal and expensive. Despite all the honest attempts made by the Jauregui family, they are unable to pay for Jhoanguel's crucial treatment. Finding himself between a rock and a hard place, Mr.

6

Jauregui saw no other alternative then to join this drug conspiracy. Mr. Jauregui loves his son more than life itself and would do anything to prolong or improve the quality of his life. Although there is never an excuse to break the law, it is difficult to fathom any better reason for doing so.

### ii) *Venezuela's Economic Situation*

Mr. Jauregui is not your typical defendant who got wrapped up in crime to shortcut his way through life. Mr. Jauregui was born in the wrong country at the wrong time. He is smart, educated, and hard working. If he were born in another country, he would likely have had a very different life where he would have been rewarded for his educational efforts and work ethic.

To that effect, it is worthwhile to cite a footnote in the presentence investigation report on Venezuela's socioeconomic and political status:

> According to multiple news sources, the crisis in Venezuela is an ongoing socioeconomic and political crisis that began in June 2010 and continues to this day. It is marked by hyperinflation, escalating starvation, disease, crime, and mortality rates. According to economists. The situation is the worst economic crisis in Venezuela's history and the worst facing a country in peace time since the mid-20th century and is more severe than that of the United States during the Great Depression.

*Id.* at 11 n. 3.

Mr. Jauregui is one of eleven siblings. Although his father, who was a fisherman, made enough money to provide food for everyone, there was not enough money for basic material needs like clothes. He began working from a young age to help his parents and siblings. Mr. Jauregui graduated high school and attended 6 semesters or three years of college. He is a skilled pharmacy technician and

paramedic. Despite his best efforts to earn a livable income using these specialized skills, it was not possible, especially considering the medical needs of his son. Mr. Jauregui was forced to turn to fishing and later to crime to try and make ends meet for his two sons. In Venezuela, like the Wild West, honest work was unfortunately not enough to support his family.

### B. First Time Offender

Prior to this case, Mr. Jauregui, who will soon be 56 years of age, has never been arrested, charged, or convicted of anything. It should also be noted that he was not on the first vessel (FV Maita) where several other codefendants were found under suspicious circumstances some time before the events of this case. Gustavo Jauregui had no part in that. In addition to all other factors mentioned in this sentencing memorandum, Mr. Jauregui deserves some lenience because of almost an entire lifetime's worth of crime-free living.

### C. Substantial Assistance

During these difficult criminal proceedings, Mr. Jauregui made the difficult choice to be the first one to come to the table and provide substantial assistance to the government. The government graciously accepted this assistance, which eventually resulted in the remaining codefendants pleading guilty thereafter. The government recognizes the importance of Mr. Jauregui's cooperation by filing, as previously alluded to, a motion for an 8-level downward departure. Docket No. 435; 18 U.S.C. § 3553(e) and (f). Mr. Jauregui was entirely truthful in his dealings with

the government and offered up many useful clarifications and volunteered other information, despite the implications that it may cause for others in the future.

It should be noted that his choice to do the right thing and cooperate may still result in harsh consequences to him and his family once he returns to Venezuela. The Court should understand the significance of this reality and sentence Mr. Jauregui to the lowest sentence possible under the law.

**D. Incarceration During an Unprecedented Pandemic**

As this Court is already aware of, 2020 was an unprecedented time in modern times because of the worldwide proliferation of COVID-19. According to the World Health Organization, as of today, COVID-19 is responsible for almost 4.5 million deaths worldwide.[3] While the situation has substantially improved, civilization as we knew it was literally on the verge of collapse.

While this was a difficult time for the average person, imagine what it must be like for a first-time offender incarcerated in a foreign country, where one does not know the language or fully understand the legal system, without any bond and no trial date in sight while your family lives in a vulnerable third-world country, incapable of effectively handling a crisis of this proportion. At any point, Mr. Jauregui himself, who is 56 years of age and suffers from hypertension, his son, who suffers from lupus and cancer, or any of his other family members could contract COVID-19 and possibly die. Mr. Jauregui was forced to constantly consider the possibility that he may never see his family again.

---

[3] https://covid19.who.int/.

Additionally, visitation—even legal visits—became impossible for some time, making it difficult for the undersigned to answer his questions, provide information about his family's wellbeing, and guide him through the proceedings.

Not all jail time is created equal. Mr. Jauregui was required to live through a difficult situation that the millions of detainees that predate him in our legal history did not. Mr. Jauregui's unfortunate timing caused him to suffer exponentially more punishment than others before him who have committed this crime. The Court should respectfully consider this reality when imposing a prison sentence.

### E. Remorse and Finding God

Although it comes at a high price, Mr. Jauregui has learned the hard way that crime does not pay. His well-intentioned desire to help his sick son and family has actually made things more difficult for them in the end. His incarceration prevents him from being able to contribute to his family in their continued time of need. Mr. Jauregui is quite remorseful and is deeply pained at having what little time he has left with his family cut short by his own actions. His family in Venezuela will never be able to visit him while incarcerated. He will never see or touch his children until he is returned to Venezuela. This realization essentially guarantees that Mr. Jauregui will never break the law again for any reason. Nothing can replace time with your family.

However, a positive that has come from this heart-breaking story is that Mr. Jauregui has found God and it has changed his entire outlook on life. To that effect, Mr. Jauregui has completed several courses that have been offered to him while

incarcerated. *See, e.g.,* Exhibit 2 (two certificates of completion). This further supports the unlikelihood of Mr. Jauregui committing another offense.

### F. Character Letters

Finally, before resting, we enclose several letters written by Mr. Jauregui's peers asking the Court for lenience and highlighting Mr. Jauregui's admirable qualities. Although they are all translated and attached as exhibits, it is perhaps useful to emphasize certain portions of them.

First, Mr. Jauregui's sister Ogleidys J. Jauregui had this to say about her brother:

> I can attest that he is a beloved person in our community, a collaborator, a good son, a good brother, a good father, always concerned about the welfare of the family. From a very young age he has worked to help our parents support the home. After forming his own family, he continued with this beautiful work. As the years went by, our mother, as well as his youngest son became ill and his enthusiasm became even greater, leading him to take on extreme jobs due to the difficult situation of the country.
> Without his presence and support, this process becomes more difficult for the family every day. For this reason, we look forward to his return.

Exhibit 3. On the other hand, Mr. Jauregui's friend of 30 years, Carlos Bravo, said the following:

> I hereby express that he is an exemplary man, a hard worker, a good son and a great family man who has dedicated himself to work from a very young age and has been willing to do everything, including deep sea fishing. He has two sons and one of them suffers from an incurable disease called lupus, the treatment of which is very expensive, and the family cannot afford the necessary expenses for the aforementioned disease. For this reason and all of the above, I ask those interested in his case to please help him to facilitate his prompt release.

Exhibit 4 (original in all capital letters). Moreover, Luis Tamiche, who has known him for more than 3 decades, and Yuraima Del Carmen Jiménez de Bravo, who has

known him for more than 20 years, also had very similar things to say about Mr. Jauregui's character and life situation. Exhibits 5 and 6. Next, Jrangel Jauregui wrote the following:

> . . . I know the citizen Gustavo Jauregui . . . attesting that he has been and is an exemplary citizen, both for society and for his relatives and acquaintances, always contributing to the support and care of his children. As a result, this citizen has had to honestly seek economic wellbeing through artisanal fishing and then moving on to deep-sea fishing, which he has been doing for most of his life.
> Your Honor, please state in your hearing the right decision for this humble and honest citizen. Thank you in advance and may God guide your decisions in this case. I bid you farewell!

Exhibit 7. Likewise, Duve M. Farfan described Mr. Jauregui in the following manner:

> . . . I have known Mr. Gustavo Rafael Jauregui Alfonso for many years, and I attest that he is an honorable, hardworking, and good-mannered person.
> He is currently in a difficult situation due to the bad situation of the country and his son's bad health condition, which have forced him into making incorrect decisions.

Exhibit 8. Perhaps the most powerful letter was submitted by Jhorman Jauregui, Mr. Jauregui's oldest son, which reads as follows:

> - My father is a good person, father, and son. Since his childhood, his life has been very humble, full of work and sacrifices to earn the daily bread for his mother, father, and his 10 siblings. Then at the age of 25, he had two children: my brother and me, being Jhoanguel Jauregui, his youngest son who is suffering from a disease called lupus, which requires an expensive lifelong treatment. In addition, he was diagnosed with cancer (malignant mesenchymal tumor) in the left thoracic wall. He has been taken to the operating table on three occasions. He was recently referred to radiation therapy for local control.
> - The economic crisis that still exists in our country has forced my father to look for any solution that would help him to get out of this situation, which is difficult for a person with low income.

Exhibit 9.

The common trend in these heartfelt letters is Mr. Jauregui's love for his family, work ethic, and his desire to do whatever it takes to help those he loves. These letters support all the previously described mitigating factors and call for a downward departure.

## IV. CONCLUSION

For all the foregoing reasons, Mr. Jauregui should be sentenced to the lowest sentence allowable under the law. Although Mr. Jauregui's sentencing guideline offense level (after granting the government's downward departure motion) would call for him to be sentenced in the 46-to-57-month range, we respectfully submit that this would still be more than what is required by the interests of justice.

The case law is clear that the Court may depart from the sentencing guidelines and the Court should exercise that discretion in this case. All the mitigating factors described above, both individually and collectively, call for a downward departure. Mr. Jauregui has already been incarcerated since November 6, 2019. Although breaking the law is wrong, he did so for a commendable reason: to pay for his son's expensive medical treatment. In addition, Mr. Jauregui has never been in trouble with the law and was the first defendant to cooperate with the government in this case. Moreover, his incarceration during an unprecedented pandemic in another country with no trial in sight without knowing if he will ever see his family again carries additional unintended punishment that those convicted of this same crime never had to deal with. Further, Mr. Jauregui is remorseful and has found God,

which makes it unlikely that he will ever reoffend. Finally, the character letters provide further support all these asseverations.

Accordingly, this Honorable Court should sentence Mr. Jauregui to the lowest sentence permissible by law, which would be a time-served term of incarceration. If anyone was ever entitled to a time-served sentence for this offense, it would be Mr. Jauregui after considering this strong amalgamation of mitigation.

**WHEREFORE**, Mr. Jauregui respectfully requests that the Honorable Court sentence him to the lowest sentence permissible by law, which would be a time-served term of incarceration. Such a sentence would be "sufficient, but not greater than necessary" in light of the totality of circumstances. *See* 18 U.S.C. § 3553(a).

**I HEREBY CERTIFY** that, in accordance with Federal Rule of Criminal Procedure 49, a true and correct copy of the foregoing has been furnished via CM/ECF to all parties or their attorneys by way of their designated email addresses, this 29th day of August, 2021.

DMRA Law LLC
1111 Brickell Ave.
Suite 1550
Miami, FL 33131
Tel. 305-548-8666

*s/ Manuel Franco*
Manuel Franco
Florida Bar No. 126443
Manuel.Franco@DMRALaw.com